JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Sean Alton appeals from his convictions after a jury trial for aggravated robbery, kidnapping, and felonious assault, all with firearm specifications, together with extortion and possession of criminal tools.
 {¶ 2} Alton presents four assignments of error. He claims the trial court erred in denying his motion to suppress evidence because the person who requested the search warrant was not a "law enforcement officer" as defined by the pertinent provisions of the Ohio Revised Code. Alton further claims his conviction are unsupported by either sufficient evidence or the weight of the evidence. Finally, Alton claims the trial court denied him his right to a fair trial by excluding character evidence he sought to introduce.
 {¶ 3} Following a review of the record, this court agrees with none of Alton's *Page 2 
claims. Consequently, his convictions are affirmed.
 {¶ 4} Alton's convictions result from an incident that occurred on the night of May 24, 2005. The victim, twenty-four-year-old Michael Nottrodt, testified to the events that led to the incident.
 {¶ 5} Nottrodt stated he met Alton in late April, 2005 when he replied to Alton's newspaper advertisement of a room for rent in his house. Alton's house was located in Westlake. Alton owned a construction-related business. Nottrodt found the home to be a large, handsome place for which five hundred dollars a month rent seemed reasonable. He provided identification to Alton, who said he wanted to "do a criminal background check" on his potential renter.
 {¶ 6} Nottrodt made his living selling tickets to sporting events, which did not provide him a consistent income, and was under indictment for committing forgery. Nevertheless, Alton accepted Nottrodt's cash as rent and permitted him to move into the house on May 1.
 {¶ 7} Nottrodt often traveled, but when he was home, he occasionally socialized with Alton, Alton's visiting friends, and the other renter, Richard Foutz. On one of these occasions, Tuesday, May 17, 2005, Nottrodt mentioned to Alton that an acquaintance, Clinton Smith, whom Alton had met, worked at an appliance store, and told Nottrodt he could sell plasma televisions at a good price. Alton expressed interest, so Nottrodt accompanied Alton to the store. Alton gave Smith $2850 and *Page 3 
received what appeared to be a store receipt for two plasma television sets. Smith promised the sets would be delivered on Thursday morning.
 {¶ 8} When no delivery occurred on the appointed morning, Alton asked Nottrodt to contact Smith. Smith indicated the delivery would be delayed until evening. However, that night, again, no delivery came.
 {¶ 9} This time, when Nottrodt attempted to contact Smith, he was unsuccessful. The following morning, Friday, Nottrodt discovered the appliance store did not employ Smith. Alton became "agitated." He informed Nottrodt that he needed the $2850 to pay his workers on Saturday, and that, since he had made the deal with Smith through Nottrodt, he held Nottrodt responsible for the money. Alton "told [Nottrodt] to do whatever [he] needed to do to obtain $2850 immediately." Since Nottrodt was living in Alton's house, he did not feel in a position to argue.
 {¶ 10} Nottrodt believed one of his ticket buyers would deposit money into Nottrodt's bank account that would be sufficient to cover the sum. Alton therefore agreed to take him to the bank to obtain the funds. When they arrived, Nottrodt found the customer's check had not yet cleared.
 {¶ 11} The next morning, Saturday, Nottrodt awakened to a "red laser light beaming" into his eyes. Since he was aware Alton had permits to keep several guns in the house; he believed the light came from a gunsight. At that time, Alton "threatened to kill [Nottrodt] if [he] did not come back with any money" that day. *Page 4 
Nottrodt got dressed, and Alton drove him to the bank. Alton "carried his firearm with him."
 {¶ 12} Once again, Nottrodt discovered the check had not cleared. When he informed Alton, Alton began "flipping out," and "demanded that [Nottrodt] stay with him [for] the rest of the day." Nottrodt thus was with Alton when Alton asked for and received a loan from another man, "Patrick," to pay his employees. Alton informed Nottrodt that he now owed over $5000.
 {¶ 13} After they returned to the house, Nottrodt received a $500 payment from a customer for some tickets. He handed the money to Alton, who, as he took it, advised Nottrodt pay the rest by "Monday or Tuesday at the latest."
 {¶ 14} On Monday, Alton called Nottrodt many times to threaten him. Nottrodt assured Alton he would obtain the money from the bank that day. However, Nottrodt later discovered that his customer's check was returned for insufficient funds. Nottrodt decided to stop answering his cellular telephone.
 {¶ 15} On Tuesday afternoon, May 24, 2005, Nottrodt's mother told him Alton stopped at her home, asking Nottrodt to call. Nottrodt decided to do so. Alton at that point seemed calm; he told Nottrodt they should "sit down like men and discuss if [he] need[ed] to make payments" on the debt. He requested Nottrodt to meet him at a men's club in Cleveland. Nottrodt agreed.
 {¶ 16} Shortly after the conversation, Alton's girlfriend Kim Thomascik called *Page 5 
Nottrodt. She stated she was nearby, asked Nottrodt to drive over to pick her up, and indicated together they would go to the meeting with Alton.
 {¶ 17} When Nottrodt and Thomascik arrived in the parking lot of the men's club, Nottrodt stopped his car near Alton's truck. Nottrodt exited his car to find Alton pointing a gun at him. Alton stated, "Get on the ground mother fucker before I kill you."
 {¶ 18} Nottrodt complied; as he lay on the pavement, Alton grabbed his hands, pulled them behind his back, and placed handcuffs on him. Alton then "picked [him] up * * * and threw [him] in" the rear seat of Alton's truck, tearing Nottrodt's shirt in that process. Alton climbed in next to him. Upon searching Nottrodt's pockets, Alton found $1204, the money Nottrodt had earned selling tickets that day. Alton appropriated $1200, replaced $4, and, holding the gun to Nottrodt's head, ordered Thomascik to drive around.
 {¶ 19} During the ride, Alton stated that for "screwing [him] over" by facilitating the transaction with Smith, he wanted Nottrodt to know "right now [he] could kill [Nottrodt] and nobody would know * * *." Alton suggested Nottrodt could obtain money from his mother. Nottrodt protested. At that point, Alton set his gun on the floor, and extracted a "taser gun" from the pocket behind the driver's seat. He placed the taser against Nottrodt's leg and activated it.
 {¶ 20} The pain of the shock caused Nottrodt to scream. According to his *Page 6 
testimony, Alton activated the taser at least ten times during the ride. At one point, Alton told Thomascik to call Richard Foutz, the other housemate. When she made the call, she passed the telephone to Alton, who told Foutz that he had Nottrodt, and could collect the money Nottrodt owed Foutz on a lost bet. He activated the taser against Nottrodt so that Foutz could "hear him scream."
 {¶ 21} When Nottrodt eventually agreed to obtain the money from his parents, Alton ordered Thomascik to return to Nottrodt's car. The two of them left Nottrodt there with "four dollars [and] pretty close to [an] empty gas tank."
 {¶ 22} Nottrodt drove to his mother's home, informed her of what had occurred, showed her the burn marks left by the taser on his skin, and indicated he would need money. The following morning, each of Nottrodt's parents provided him with a certified check in the amount of $2500. Nottrodt took the checks to Alton's house. Alton accepted them and indicated he was satisfied. Nottrodt then took his parents' advice and proceeded to the Westlake police department.
 {¶ 23} After listening to Nottrodt's story and observing the marks on his leg, police officer Charles Escalante, who was assigned to the detective bureau and held the position of "Executive Assistant" to the Chief of Police, made an application for a search warrant for Alton's house. He obtained a judge's signature and executed the warrant on the morning of May 25, 2005. During the search, police officers found, inter alia, the gun, handcuffs and taser unit Nottrodt described in his account of the *Page 7 
incident.
 {¶ 24} Alton subsequently was indicted on two counts of aggravated robbery, two counts of felonious assault, and one count of kidnapping, all with a firearm specification, one count of extortion and one count of possession of criminal tools. Prior to trial, he filed a motion to suppress evidence. The trial court held a hearing on the motion before overruling it.
 {¶ 25} During its case-in-chief, the state presented the testimony of Nottrodt, Thomascik, Foutz, Nottrodt's parents, and two police officers. The jury eventually acquitted Alton of one count of aggravated robbery and one count of felonious assault, but found him guilty of the remaining charges. The trial court ultimately sentenced him to a term of incarceration that totaled eight years.
 {¶ 26} Alton challenges his convictions with the following assignments of error:
 {¶ 27} "I. The trial court erred in denying Appellant's motion to suppress evidence where the affiant officer was not a legally and duly sworn police officer for the law enforcement agency which effected the search of Appellant's home.
 {¶ 28} "II. The trial court erred in denying Appellant's Criminal Rule 29 motion (sic) for acquittal when there was insufficient evidence to prove the elements of aggravated robbery, felonious assault, kidnaping (sic) and extortion.
 {¶ 29} "III. Appellant's convictions were against the manifest weight of the evidence. *Page 8 
 {¶ 30} "IV. The trial court erred in excluding evidence offered by Appellant, in violation of Appellant's constitutional right to a fair trial."
 {¶ 31} In his first assignment of error, Alton argues that the search warrant pursuant to which the police discovered his guns, the handcuffs, and the taser unit that Nottrodt identified as the ones Alton used during the incident was invalid.
 {¶ 32} He contends that evidence should have been suppressed on the ground that Escalante was not a "law enforcement officer" as defined in R.C. 109.71-77 and R.C. Chapter 124. Alton thus claims that, since Escalante was appointed to his position without taking a civil service examination, he was not qualified to seek a search warrant. This claim ignores the testimony provided to the trial court at the hearing on Alton's motion to suppress evidence.[1]
 {¶ 33} Westlake's chief of police testified that Escalante "started as a part-time patrol officer assigned to the detective bureau" in 1999, that Escalante was "a sworn police officer" with "current certifications as an Ohio peace officer," and had attended training in order "to maintain that status." The chief testified that as his *Page 9 
executive assistant, Escalante continued to work in the detective bureau "in charge of vice and narcotics" investigations. The chief considered Escalante his department's "expert on preparing affidavits in support of criminal * * * seizure warrants."
 {¶ 34} Indeed, Alton's argument also ignores the concession made by his attorney at the conclusion of the hearing. When the trial court explained that a sworn police officer who was "able to be an affiant on a search warrant" could at the same time hold a city position that exempted him from the civil service, defense counsel stated that he was unaware of that, and that he was under the impression the two roles were "mutually exclusionary." Further cross-examination of the chief of police caused counsel to abandon his argument and to concede "for the record" that, by virtue of his appointed position as executive assistant, Escalante "can act as a police officer in the City of Westlake without taking a civil service exam."
 {¶ 35} For the foregoing reason, Alton's first assignment of error is overruled.
 {¶ 36} Alton next argues in his second and third assignments of error that his convictions are unsupported by either sufficient evidence or the weight of the evidence. In making these arguments, Alton essentially asserts Nottrodt's testimony was too conflicting to constitute proof of the offenses of aggravated robbery, kidnapping and felonious assault with a firearm, in addition to extortion and possession of criminal tools. This court disagrees. *Page 11 
 {¶ 37} In considering a claim of insufficient evidence, this court is required to view the evidence adduced at trial, both direct and circumstantial, in a light most favorable to the prosecution to determine if a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt. State v.Dennis, 79 Ohio St.3d 421, 1997-Ohio-372; State v. Jenks (1991),61 Ohio St.3d 259.
 {¶ 38} With regard to an appellate court's function in reviewing the weight of the evidence, this court is required to consider the entire record and determine whether in resolving any conflicts in the evidence, the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 39} The record in this case leads to the conclusion that Alton's convictions are supported by both sufficient evidence and the weight of the evidence. Contrary to Alton's assertion, Nottrodt's testimony was logical, coherent, and compelling.
 {¶ 40} Nottrodt stated that Alton confronted him with a gun, that he recognized the gun as one for which Alton had obtained a permit, that Alton handcuffed him, then took over a thousand dollars from him, and that Alton kept him captive, subjecting him to numerous electric shocks from the taser, which caused severe pain and burned his skin, before releasing him upon a promise to bring more money from his parents, money which Alton accepted the following day. *Page 12 
 {¶ 41} From this testimony, a rational trier of fact could determine Alton knowingly committed aggravated robbery and kidnapping and felonious assault with a firearm, together with extortion and possession of criminal tools. State v. Dorsey, Cuyahoga App. No. 87580,2006-Ohio-5918; State v. Jackson, Cuyahoga App. No. 86542, 2006-Ohio-1938; State v. Martin (Oct. 28, 1999), Cuyahoga App. No. 73456; State v. Suber, 154 Ohio App.3d 681, 2003-Ohio-5210.
 {¶ 42} Nottrodt's testimony was corroborated by the testimony of Thomascik, Foutz, and his parents. It found further corroboration in the physical evidence; the photographs displayed Nottrodt's injuries, and Nottrodt's parents identified two certified bank checks they caused to be made out to Alton, each dated May 25, 2005 and each in the amount of $2500. Therefore, this court cannot find that the jury clearly lost its way in resolving any evidentiary conflicts. State v. Dorsey, supra.
 {¶ 43} Under these circumstances, Alton's convictions are supported by both sufficient evidence and the manifest weight of the evidence. Accordingly, his second and third assignments of error also are overruled.
 {¶ 44} Alton argues in his fourth assignment of error that the trial court's decision to prevent him from offering evidence of his nonagressive character compromised his right to a fair trial. This argument is unpersuasive in light of the record.
 {¶ 45} Evid. R. 404(A)(1) permits the accused in a criminal prosecution to offer *Page 13 
appropriate evidence supporting his good character in order to establish that he acted in conformity with that good character on the particular occasion of the crime charged, and therefore did not commit the crime.State v. Nobles (1995), 106 Ohio App.3d 246. Nevertheless, the exclusion of such evidence does not always constitute reversible error; instead, it may be harmless error. In the matter of Definbaugh, Tuscarawas App. No. 2003AP03-0021, 2003-Ohio-6138.
 {¶ 46} The record in this case demonstrates that the evidence which the trial court prevented Alton from introducing during his case-in-chief already had been elicited on cross-examination of two of the state's witnesses. Thomascik testified Alton had licenses to own his guns, she had never before seen him use them improperly, and she thought of him as a successful businessman. Similarly, Foutz stated that in his experience living in Alton's house, he believed Alton to be a reliable person and a responsible gun owner whom he had never seen to be violent or hurtful to anyone.
 {¶ 47} Under these circumstances, the jury was cognizant of Alton's general character. In light of the overwhelming evidence of his guilt of the offenses in this case, therefore, the trial court's refusal to permit additional character evidence must be deemed harmless error. Id.;State v. Williams (1983), 6 Ohio St.3d 281, paragraph six of the syllabus.
 {¶ 48} Alton's fourth assignment of error, therefore, also is overruled. *Page 14 
Affirmed.
1It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, P.J. CONCURS
[1] Even if this court were to find Alton's claim supported in the record, the decision in United States v. Freeman (8th
Cir. 1990), 897 F.2d 346 would render his argument unpersuasive. Using the analysis set forth in Freeman, a violation of the state "procedural requirements" which govern the application for a search warrant generally would not trigger the exclusionary rule unless: 1) the search either might not have occurred or would not have been so abrasive if the requirements had been followed, or 2) there is evidence of an intentional disregard of the requirements. The testimony adduced at the hearing established neither of those exceptions. See also, United Statesv. Luk (9th Cir. 1987), 859 F.2d 667.