THE STATE OF OHIO, APPELLANT, *v.* MATTHEWS, APPELLEE.

[Cite as State v. Matthews (1976), 47 Ohio St. 2d 119.]

(No. 75-200—Decided July 21, 1976.)

120

Mr. *George C. Smith*, prosecuting attorney, and *Mr. David Graeff*, for appellant.

Mr. *Myron Shwartz*, for appellee.

*Per Curiam.* On authority of *State* v. *Robinson* (1976), 47 Ohio St. 2d 103, decided this day, we agree with the Court of Appeals that the trial court erred in instructing the jury that the defendant has the burden of proving by a preponderance of the evidence that he acted in self-defense.

The other issue in the case relates to the admission over objection of certain testimony of a police officer. The prosecution contends that the testimony, which includes a statement made to the officer by a third person, is admissible as an exception to the hearsay rule, on the theory that the reply of the defendant was evasive or equivocal, and that such response may be introduced in evidence as an admission.

The legal principle involved is stated in McCormick on Evidence, at pages 651-52 (2 Ed. 1972), as follows:

"If a statement is made by another person in the pre-

sence of a party to the action, containing assertions of facts which, if untrue, the party would under all the circumstances naturally be expected to deny, his failure to speak has traditionally been receivable against him as an admission. Whether the justification for receiving the evidence is the assumption that the party has intended to express his assent and thus has adopted the statement as his own, or, the probable state of belief to be inferred from his conduct is probably unimportant. Since it is the failure to deny that is significant, an equivocal or evasive response may similarly be used against him on either theory, but if his total response adds up to a clear-cut denial, this theory of implied admission is not properly available." (Footnotes omitted.)

See, also, 4 Wigmore, Evidence, Section 1071-72 (Chadbourne Rev. 1972); 3 Wharton's Criminal Evidence (13 Ed.), Section 701; Cf. *Geiger* v. *State* (1904), 70 Ohio St. 400, 71 N. E. 721.

The officer testified that when he originally questioned the defendant, the defendant stated that "the man reached into his pocket and pulled out a gun and was aiming it at him and he [the defendant] fired his first shot." In a stenographic statement made the same day, the defendant stated that "[w]hen the gentleman got the gun about head high or approximately neck high, I came out with my gun, the .22 revolver." Those statements were made on June 9. On June 12, the defendant was questioned again and made a handwritten statement. The testimony of the officer concerning that occasion is as follows:

"Q. Go ahead and testify and tell us what happened.

"A. All right, sir. I asked Mr. Matthews, correction, I told Mr. Matthews that I had been told that when he shot the man that the man did not have a gun in his hand. Mr. Matthews stated as near as I can recall to be exact, Mr. Ron, what were you told. And, I said that the man had a hand on the bar and a hand on the stool and was just proceeding to get up when you shot him and he stopped for a few minutes and did answer me and stated that perhaps

that the witnesses who saw what had happened missed the fact that when the man's hand was coming from the bar that it was about halfway between the bar and his pocket, when he pulled his gun and fired.

"Q. When who pulled whose gun?

"A. Mr. Matthews pulled his gun and fired. So, at this point, after he had written out this particular portion of his statement prior to this question that we have discussed, I asked Mr. Matthews why he had written that the man had his hand in his pocket and was coming out with something because it differed from what I had talked with him about just prior to his writing this particular portion of this statement. And, he told me that for him to write out what we had talked about would hurt him too much, and at this point, I went back to the statement and told him that the statement was not correct, and then asked him a question which was whether or not the man had a gun out when he was shot or had a gun in his hand when he was shot, and Mr. Matthews then wrote, 'Did you see his gun all the way out of his pocket before you fired.' and answered it * * *.

"* * *

"A. 'No, not his gun, but his hand was halfway out of his pocket although I could not tell if it was a gun, a knife, a bottle, but it was something other than his hand.'"[1]

Under these circumstances, the response of the defendant was an admission that his previous statements were not correct and that even he himself could not clearly see that the victim had a gun in his hand, contrary to his prior accounts. It was also evasive and equivocating as to whether the victim's hand had even reached his gun at the time defendant shot him. The officer's hearsay statement was thus admissible under the principle stated, because the defendant's response was in part evasive and equivocating, and in part an express admission of the statement. Finding no error in the trial court's admittance of the officer's testi-

---

[1] This quotation is taken from the typewritten copy of the videotape transcript of the proceedings, and differs slightly from the quotation in the opinion of the Court of Appeals.

mony, we therefore reverse the Court of Appeals as to that issue.

The judgment of the Court of Appeals is reversed in part and affirmed in part, and it is directed that the cause be remanded for a new trial.

*Judgment reversed in part and affirmed in part.*

O'NEILL, C. J., CORRIGAN, STERN, W. BROWN and P. BROWN, JJ., concur.

HERBERT, J., concurs in the judgment of affirmance in part on the basis of the syllabus in *State* v. *Robinson* (1976), 47 Ohio St. 2d 103.

CELEBREZZE, J., dissents in part.

CELEBREZZE, J., dissenting in part. Because I disagree that the police officer's testimony concerning a conversation he had with the defendant, in which he related to the defendant what purportedly had been told to him by an unnamed third person, falls within a recognized exception to the hearsay rule as applicable in criminal cases, I must respectfully dissent from that part of the judgment of this court rendered herein sanctioning the use of such tainted testimony.

It is axiomatic that the purpose of the hearsay rule is to ensure that only reliable evidence is adduced at trial. In this regard, two procedural safeguards have been considered by the courts of this country as, generally, essential prerequisites to any determination that certain evidence is reliable. I am referring, of course, to the guaranty of truthfulness enveloping the oath of a witness, and to the process of probing the truth and accuracy of a witness' testimony known as cross-examination.

With regard to the latter safeguard, our adversarial process of confrontation and cross-examination of witnesses has proven especially effective in criminal cases, where an accused is deemed to be innocent until and unless the

prosecution is able to establish his or her guilt beyond a reasonable doubt. Throughout the years skillful cross-examination of a key witness has turned many a case from what, at first blush, may have appeared to be open and shut, into that gray area of decision upon which reasonable minds might differ.

In the case at bar, *no direct evidence* was presented at trial through the testimony of the only two "eyewitnesses" to the shooting concerning the sequence of events *immediately prior* to the actual firing of shots. Neither "eyewitness" observed either the actual shooting, or the parties to the shooting, the deceased and the defendant, immediately prior to hearing the sound of gunfire.

Prosecution witness Barbara Walker, the barmaid at the Oasis Bar on the evening in question, after relating that an argument commenced between the deceased and the defendant, testified, in pertinent part:

"Q. Okay, and you say the argument got more heated?

"A. Uh-huh.

"Q. Okay, and what did you do next then?

"A. Well, when they started getting louder, usually in the bar, when a fight, you know, when a fight somebody start arguing, get to fighting, (inaudible) the barmaid try to get out the way, cause they usually start throwing beer bottles or ash trays and then they start arguing, I thought maybe the defendant was going to throw some of his little glasses at him or something, so I moved you know, this is the way I was thinking, so I moved, you know, went walking towards the cash register, I still had his money in my hand for the drink.

"Q. Baby brother's money?

"A. Yes. And I started toward the cash register which was about from here to there, and by the time I got to the back part of the cash register, I just glanced back like this and I seen the flash.

"Q. You seen a flash, what do you mean?

"A. From the gun.

" * * *

"Q. Okay. And, this argument was going on, did you have occasion to see Baby Brother?

"A. I seen him get up from the bar, yes.

"Q. This was right before the flash?

"A. Yes.

"Q. Did you hear a shot too, I assume?

"A. Yes, I heard the shot.

"Q. Okay, and did he have, did you see either one of Baby Brother's hands?

"A. Yeah, his right hand, he pushed himself away from the bar. You know, I mean just like getting up, just to the bar and getting up.

"Q. What about the left hand?

"A. He was standing near the jukebox and while I was there, the few minutes, you know when the argument was still going on, he was standing up there talking you know, like using one hand, talking.

"Q. Did you see a gun in either one of his hands?

"A. No, I didn't see nothing.

"Q. Okay, and did you see—after the first shot, tell us what happened?

"A. Well, after the first shot, like I said, I was at the cash register. We call it that, but it's the drawer right at the cash register in front, and I had to bend over to get the keys to go in the office. So, at the first shot, when I looked back and seen the flash, and you know, people's hollering, he's been shot, so I was going into the office, get the keys, go in the office and call the emergency squad and by the time I got the keys, I heard the second shot, so everybody was stooping down, so I went on out the door and called the emergency squad.

"Q. And did you see the defendant?

"A. When I come back out the office, he walked out.

"Q. He was walking out the front door or the rear door?

"A. The front door.

"Q. Okay, now, when you first heard that shot and you saw that flash, are you with me, okay. When you first saw

the flash and heard the gun go off, did you see Baby Brother?

"A. When the flash went off, I seen him fall, I mean—

"Q. And it happened simultaneously then?

"A. Yeah, I can't say he hit the floor because the bar head was between me and him.

"Q. Okay, but you seen him start to fall?

"A. Right.

"Q. And how long was it would you say between the first shot and the second shot?

"A. It was seconds.

"    *  *  *

"Q. And, you saw Baby Brother fall onto the floor, is that right?

"A. No, I didn't see him hit the floor, I just seen him falling.

"Q. Okay, he disappeared behind what was the bar?

"A. Right.

"Q. And, at that time, did you see a gun in Baby Brother's hand?

"A. No, I did not.

"Q. At any time did you see a gun in Baby Brother's hand?

"A. No."

On cross-examination, Ms. Walker testified, in pertinent part, as follows:

"Q. Then actually you saw, I think you said you saw Baby Brother get up, then you walked toward the register, is that correct?

"A. When he got, up, well, I was standing there, talking to him, like I said, and when he got up from the bar, he stood there and they argued and argued, and it was getting louder, you know, cussing and so I walked away.

"Q. And then actually your back was to the whole incident from the time you walked away until you happened to glance around and see the fire? And, then when you saw the flash, you went to your office and called the emergency squad?

"A. When I seen the flash of the gun, and heard the shot, then I reached down and got the keys and when I got the keys, I heard another shot, and I went to the office to call the emergency squad."

The other "eyewitness," bartender William Holmes, testified, in pertinent part:

"Q. And after you first saw Matthews, where did he go?

"A. Well, he was up there in front, selling some flowers I went to the back. That's the last time I saw him. When I got up off the floor, one fellow took and asked me where what's going on and I said what happened. He just told me, said fellow had the flowers just shot that fellow, he's laying out there in the aisleway.

"Q. And what did you do?

"A. Took and went up there to see what it was, he was laying there. People start crowding around, I told them to stand back so he could get some air. In the meantime, Barbara had run back in the office and called the emergency squad.

"Q. Now, how long would you say after the second shot, how long would you say it was that you ran around to see where the body was?

"A. I imagine about ten seconds later.

"Q. When you got to the body, was Elijah Matthews around?

"A. No."

It is clear from a review of the foregoing testimony that neither "eyewitness" was in a position to observe whether the deceased had a gun or other dangerous implement in his hand *at the time* the defendant opened fire. Yet Detective Ronald Price was permitted, over defense objection, to offer the following testimony concerning a conversation he had with the defendant while the defendant was in custody:

"Q. Go ahead and testify and tell us what happened.

"A. All right, sir. I asked Mr. Matthews, correction, *I told Mr. Matthews that I had been told that when he shot*

*the man that the man did not have a gun in his hand.*
Mr. Matthews stated as near as I can recall to be exact,
Mr. Ron, what were you told. And, I said that the man had
a hand on the bar and a hand on the stool and was just pro-
ceeding to get up when you shot him and he stopped for a
few minutes and did answer me and stated that perhaps
that the witnesses who saw what had happened missed the
fact that when the man's hand was coming from the bar that
it was about halfway between the bar and his pocket, when
he pulled his gun and fired.

"Q. When who pulled whose gun?

"A. Mr. Matthews pulled his gun and fired. So, at
this point, after he had written out this particular por-
tion of his statement prior to this question that we have
discussed, I asked Mr. Matthews why he had written that
the man had his hand in his pocket and was coming out with
something because it differed from what I had talked with
him about just prior to his writing this particular portion
of this statement. And, he told me that for him to write
out what we had talked about would hurt him too much, and
at this point, I went back to the statement and told him that
the statement was not correct, and then asked him a ques-
tion which was whether or not the man had a gun out when
he was shot or had a gun in his hand when he was shot, and
Mr. Matthews then wrote, 'Did you see his gun all the way
out of his pocket before you fired,' and answered it, as I
have previously testified.

"Q. What was his answer again at that point?

"A. 'No, not his gun, but his hand was halfway out of
his pocket although I could not tell if it was a gun, a knife,
a bottle, but it was something other than his hand.' " (Em-
phasis added.)

A majority of this court characterizes the foregoing
question and answer session as "an admission [of the de-
fendant] that his previous statements were not correct and
that even he himself could not clearly see that the victim
had a gun in his hand, contrary to his prior accounts. It was
also evasive and equivocating as to whether the victim's

hand had even reached his gun at the time defendant shot him.''

In placing its imprimatur of approval upon the use of such testimony, a majority of this court relies primarily upon a passage from McCormick on Evidence. In this passage, McCormick lumps together tacit admissions by silence with tacit admissions by evasive or equivocating answers, on the premise that ''it is the failure to deny that is significant.''

However, in Ohio, it has long been settled that testimony relating the conduct of an accused in remaining silent when faced with a custodial accusation may not be received in evidence against him, for to do so would constitute a violation of the accused's Fifth Amendment rights. See *Zeller* v. *State* (1931), 123 Ohio St. 519, and *Geiger* v. *State* (1904), 70 Ohio St. 400. See, also, *Weaver* v. *State* (1929), 120 Ohio St. 97. Although, prior to 1966, some states (see, *e. g.*, *Boulton* v. *State* [Tenn. 1964], 377 S. W. 2d 936; *State* v. *Miles* [1963], 191 Kan. 457, 382 P. 2d 307; *Miller* v. *State* [1963], 231 Md. 215, 189 A. 2d 635) permitted the introduction of such testimony upon the premise stated by McCormick, the decision of the Supreme Court of the United States in *Miranda* v. *Arizona* (1966), 384 U. S. 436, clearly settled the divergence of opinion among the states on this question in favor of the Ohio position. Therefore, the particular passage from McCormick on Evidence relied upon by the majority should be closely scrutinized, in that it has been rejected, at least in part, by the decision in *Miranda* v. *Arizona, supra.*

The issue in the instant case, however, does not involve the defendant's Fifth Amendment rights, for he expressly waived such rights on the three occasions he voluntarily gave a statement to the police. Admission of such statements in evidence does not necessarily follow as a matter of course, however, merely from the fact that the statements were voluntarily given by the defendant.

The majority has chosen to articulate the evidentiary issue advanced in the instant cause as whether an

evasive and equivocal response by the defendant to an extrajudicial accusation may be admitted in evidence as an exception to the hearsay rule. Although not relied upon by the majority, there is support for the proposition that such evidence is admissible. See, *e. g., Jethroe* v. *State* (Ind. 1974), 319 N. E. 2d 133; *People* v. *Preston* (1973), 107 Cal. Rep. 300 , 508 P. 2d 300; *Commonwealth* v. *Jefferson* (1968), 430 Pa. 532, 243 A. 2d 412.

To this writer, however, the crucial aspect of this case, apparently one of first impression in Ohio, revolves around the framing of the question posed to the defendant by Detective Price. The detective essentially told the defendant that an eyewitness to the shooting had stated that the deceased did not have a gun in his hand when he was shot. This statement prompted the defendant to retreat somewhat from his former claim to the contrary, and maintain that he "could not tell if it was a gun, a knife, a bottle, but it was something other than his hand."

Since a gun apparently in the possession of the deceased at the time of the shooting was recovered by the police, and introduced in evidence at trial, this testimony was the *only* testimony offered at trial tending to disprove the defendant's claim of self-defense. Moreover, and most importantly, the "eyewitness" to whom the detective was apparently referring, barmaid Barbara Walker, did *not* testify in court in the manner suggested by the detective in his questioning of the defendant. Quite the contrary, a reading of her testimony clearly reveals that she did not observe the deceased during those few crucial seconds at which time the defendant claimed the deceased had a gun drawn on him. It is obvious, at least to this writer, that the question posed by the detective to the defendant was highly misleading, and admission of such testimony at trial was patently prejudicial to the defendant under the circumstances of this case.

Whether the question framed by the detective was deliberately misleading, or not, is of no significance. What matters is the result of the questioning, and, under the facts

of this case, the defendant was clearly misled. The possibility of prejudice to the defendant's constitutional rights, whether intentional or unintentional, inherent in custodial interrogations was a major factor contributing to the decision in *Miranda* v. *Arizona, supra.* (384 U. S. 436). In *Miranda*, at page 451, the court reviewed numerous police manuals suggesting various approaches to securing confessions from defendants in criminal cases. One such approach parallels the result obtained in the cause at bar, and bears repetition here:

"The manuals suggest that the suspect be offered legal excuses for his actions in order to obtain an initial admission of guilt. Where there is a suspected revenge-killing, for example, the interrogator may say:

" 'Joe, you probably didn't go out looking for this fellow with the purpose of shooting him. My guess is, however, that you expected something from him and that's why you carried a gun—for your own protection. You knew him for what he was, no good. That when you met him he probably started using foul, abusive language and he gave some indication that he was about to pull a gun on you, and that's when you had to act to save your own life. That's about it, isn't it, Joe?'

"Having then obtained the admission of shooting, the interrogator is advised to refer to circumstantial evidence which negates the self-defense explanation. This should enable him to secure the entire story. One text notes that 'Even if he fails to do so, the inconsistency between the subject's original denial of the shooting and his present admission of at least doing the shooting will serve to deprive him of a self-defense "out" at the time of trial.' "
(Footnotes omitted.)

In my view, introduction of such tainted testimony in evidence denigrates the teachings of *Miranda*, and prejudices the right of the defendant to a fair trial. The question remains whether admission of such testimony can be characterized as harmless error, or was so prejudicial as to merit a new trial.

Since no constitutional right[2] of the defendant is here involved, the issue being one purely of state evidence law, the "harmless beyond a reasonable doubt" standard of *Chapman* v. *California* (1967), 386 U. S. 18, 24, does not strictly apply. However, the test as posited by the Supreme Court in *Chapman* can be utilized here to guide resolution of the issue as to whether admission of such testimony was prejudicial to the defendant. In *Chapman*, at page 23, quoting from *Fahy* v. *Connecticut* (1963), 375 U. S. 85, 86-87, the court stated: " 'The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' "

Under the facts of this case as previously recited, there is no doubt in my mind that admission of such testimony "contributed to the conviction."

Accordingly, I would hold such testimony inadmissible at trial upon remand, and affirm the Court of Appeals decision in this regard.

---

[2]Although not argued in the briefs, the only conceivable constitutional right of the defendant involved in the admission of the testimony complained of is the Sixth Amendment right of each defendant to confront his accusers.

Since the "eyewitness" to whom the detective was referring, barmaid Barbara Walker, did testify at trial, the defendant had an opportunity to exercise, and did, in fact, exercise his constitutional right to cross-examine and confront the witnesses testifying against him. However, it should be remembered that Ms. Walker had already testified at the time Detective Price took the stand, and that the jury had no idea that the "eyewitness" to whom the detective referred was Ms. Walker.

It could be argued, therefore, that the defendant was effectively deprived of his right to confrontation under the circumstances described above. However, the defendant could have called Ms. Walker to the stand as a hostile witness in his case, and cross-examined her further with respect to the detective's testimony concerning her statement to him. See, e. g., *Childs* v. *Cardwell* (C. A. 6, 1971), 452 F. 2d 541, certiorari denied, 407 U. S. 912.

Accordingly, in my view, no Sixth Amendment issue is presented upon the facts of this case.