[Cite as *State v. Hubbard*, 2023-Ohio-3468.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 111939 |
| QUINCY HUBBARD, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 28, 2023

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-655277-B

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey S. Schnatter and Margaret Graham, Assistant Prosecuting Attorneys, *for appellee*.

Erin E. Hanson, *for appellant*.

MARY J. BOYLE, J.:

{¶ 1} In this companion appeal, defendant-appellant, Quincy Hubbard ("Hubbard"), challenges his felonious assault conviction and sentence following a

joint trial.[1]  For the reasons set forth below, we affirm.

## I. Facts and Procedural History

{¶ 2}  In January 2021, Hubbard was charged with codefendants, Deandre Price ("Price") and Tyrell Wilkins ("Wilkins"), in a five-count indictment.[2]  Count 1 charged Hubbard and Price with aggravated murder and carried both a one- and three-year firearm specification.  Count 2 charged Hubbard and Price with murder and carried both a one- and three-year firearm specification.  Count 3 charged Hubbard and Price with felonious assault and carried both a one- and three-year firearm specification.  Count 4 charged Wilkins with tampering with evidence, and Count 5 charged him with obstruction of justice.  Each of Counts 4 and 5 carried a one-year firearm specification.  The charges arise from the shooting death of Malik Moore ("Moore") as he was walking home on a residential street.

{¶ 3}  The matter proceeded to a jury trial in May 2022.[3]  The day before trial, the court held a hearing with Price and Hubbard on Hubbard's motion to sever because of the anticipated testimony of Jerry Howard ("Howard"), who claimed that he was with Price, Hubbard, and Wilkins when Price described how he killed Moore and Hubbard stated that he could not watch when Price shot Moore.  Defense counsel argued that Howard's testimony about what Price and Hubbard said to him

---

[1] This appeal is a companion appeal to *State v. Price*, 8th Dist. Cuyahoga No. 111921.

[2] Codefendant Wilkins has not filed an appeal as of the date of this opinion.

[3] Wilkins's case was severed from Hubbard and Price's case.

is impermissible hearsay testimony. Howard's testimony stems from a proffer he gave in a pending federal gun case he had at that time. Defense counsel further argued that the allowance of Howard's testimony would violate Hubbard's constitutional right to confrontation because the defense would not get an opportunity to cross-examine either defendant's statement. Defense counsel argued that Hubbard and Price should be tried separately because the defense would not be able to test the truthfulness of the codefendant's statements in a joint trial.

{¶ 4} The state opposed, arguing that the statements made by Price and Hubbard to Howard are not hearsay because they are statements made by a party-opponent under Evid.R. 801. The state explained:

> So when you have got four people engaging in a conversation and one is describing how he committed a homicide and the other one says: I couldn't watch when [Price] shot [Moore], the first person doing the speaking is putting forth his whole statement.

> When [Hubbard] says: I couldn't watch, he's essentially adopting everything that [Price] is saying. He's not refuting any of it.

> * * *

> So that makes the statement made attributable to both [Hubbard] and [Price].

(Tr. 30-31.) The state also argued that Howard's testimony is a statement against interest because "everything that [Price] says [Price] says. When [Hubbard] doesn't refute anything [Price] says, but simply says: I couldn't watch when [Price] shot [Moore], he, in essence, has adopted the truthfulness of [Price's] statement." (Tr. 31.) Lastly, the state argued that the statement is nontestimonial because the

statement occurred during a conversation between friends about the involvement in a crime with no investigative agencies involved.

{¶ 5} With regard to having separate trials, the state argued that there is no reason to sever the trial because of Howard's testimony. The state believed that any prejudice towards Price could be undone with a jury instruction because what Hubbard said "is merely his statement in the context of what [Price] says, not offered for the truth of the matter asserted, but just to show he heard what [Price] said and adopted it." (Tr. 47.)

{¶ 6} Prior to the trial court announcing its decision, both counsel for Price and Hubbard agreed that the codefendants' comments are nontestimonial. In reaching its decision on the motion, the trial court acknowledged that "[t]hese are complicated issues and the Court has researched it for a rather lengthy period of time." (Tr. 53.) The court further stated, "I think it is a very close call, but I also think that the courts have handed down clear law on this * * *." (Tr. 53.) And based on the caselaw, the trial court denied the motion to sever and allowed Howard's testimony. The matter then proceeded to a joint trial, where the following evidence was adduced.

{¶ 7} On September 12, 2020, Moore was walking home when Price and Hubbard tracked him down through the residential neighborhoods of Cleveland Heights, shot at Moore 17 times, and killed him. Just prior to the shooting, Moore was at the CVS near the intersection of Cedar and Lee Roads in Cleveland Heights. Surveillance video from the CVS was played for the jury. The video depicts Moore

walking inside CVS a little before 10 p.m.  He made a purchase and then exits the CVS.  Surveillance video from a neighboring business, Twisted Minds Smoke Shop, then depicts Moore at that shop making a purchase.  Moore exited the smoke shop and proceeded southbound on Lee Road towards his house.  Surveillance video from a local business captured Moore walking westbound on Meadowbrook Road with a cell phone in one hand and a paper bag in the other.  Cleveland Heights Police Sergeant David Speece ("Sgt. Speece") testified that the logical path for Moore to get home would have entailed him "heading down Meadowbrook Boulevard, straight down Oakdale to his house[.]"  (Tr. 474.)

{¶ 8}  Moore was shot while he was on Oakdale Road at 10:07 p.m.  A resident who heard many gunshots immediately looked out of her window onto Oakdale and observed a vehicle at the corner of Meadowbrook and Oakdale.  The vehicle reduced its speed at the intersection and then quickly accelerated away from the direction of the gunshots.  The resident was able to provide police with a sketch of the taillights of the vehicle.  The resident described the vehicle as dark in color and having a unique taillight shape:  the taillights were continuous and white in color.

{¶ 9}  Several other witnesses in the area also testified regarding the shooting.  The witnesses testified that they observed a dark-colored vehicle drive quickly down the street with taillights that were "like an LED light maybe that like wrapped around the car."  (Tr. 277.)  The witnesses described the vehicle's exhaust as loud, deep sounding, "like a sports car."  (Tr. 277.)  When describing the gunshots,

the witnesses testified that they heard "several bangs and then a pause and then more bangs." (Tr. 289.) One witness also observed "a figure move behind the car from the driver's side to the passenger's side" and then the car sped up as it drove away. (Tr. 291.)

{¶ 10} On the scene, officers located a total of 13 shell casings near Moore's body. Officers also located a CVS bag, containing a drink and a bag of chips, several houses down from where Moore's body was found. Cleveland Heights police reviewed doorbell camera footage provided on the scene, which was played for the jury. Seventeen gunshots and a deep muffler sound described by the witnesses could be heard on the video. This video combined with the witnesses' descriptions of the vehicle led Sgt. Speece to surmise that the suspect vehicle was a Dodge Charger.

{¶ 11} Based on this information, Cleveland Heights Police began searching for what they believed to be a Dodge Charger by using the city's license plate reader at Cedar and Lee Roads. The police eventually located a Dodge Charger, which was registered to Price, travelling north on Lee Road at 9:19 p.m. Investigators also began searching video footage from businesses in the area, including the CVS Moore visited. The exterior surveillance video from CVS was played for the jury and depicts a Dodge Charger driving into the CVS parking lot around 9:37 p.m. The vehicle was metallic in color and had aftermarket wheels, which appeared to be the similar wheel style as the Dodge Charger observed in the license reader video footage. A male, later identified as Price, was seen exiting the vehicle approximately ten minutes

later. He entered the Twisted Minds Smoke Shop, made a purchase, and then walked back to his car around 9:52 p.m.

{¶ 12} Price was sitting in his vehicle when Moore exited CVS and walked to the smoke shop. While Moore was in the smoke shop, Price exited his vehicle and walked back towards the shop, disappearing momentarily out of view and then reappearing, walking back to his vehicle. Shortly thereafter, Moore exited the smoke shop and walked home. Price then exited the parking lot in his car, heading in the opposite direction at 10:01 p.m., which was approximately six minutes before the homicide.

{¶ 13} As part of their investigation into Price, police spoke with Moore's relatives. Hubbard's name was mentioned as someone who had fought with Moore over the course of the past several years. Moore's uncle testified that he knew Price and Hubbard from the basketball court and there was a fight between them and Moore about seven or eight years ago that resulted in "bad blood." (Tr. 833.) Moore's uncle had a tooth knocked out during the fight. Moore's uncle also testified to situations over the years of where Hubbard bullied Moore, including picking on Moore, wanting to fight him, and following him. One instance, which occurred approximately one month before Moore's murder, involved an altercation between Moore's uncle, Moore, and Hubbard at the same CVS.

{¶ 14} Cleveland Heights Police Captain Jeremy Young ("Cpt. Young") testified that during their investigation, Hubbard's name was listed as an associate of Price. He further testified to a dispatch call one month prior to the homicide at

the same CVS involving a fight between three black males and one black female, but the people involved left the scene before the police arrived. Cpt. Young learned that there was an ongoing investigation where officers were conducting surveillance at 3519 Meadowbrook, which is a short distance from the murder scene. During their surveillance of 3519 Meadowbrook, officers observed Price's Dodge Charger in the driveway and Price coming and going from the home.

{¶ 15} Detectives eventually executed a search warrant at 3519 Meadowbrook. Price, Howard, and Wilkins all resided there and the three of them were arrested at that time. At the time of trial, Howard testified that he was currently incarcerated pending federal gun charges. He testified that he grew up with Price, Wilkins, and Hubbard and has known them for 13 years. Howard was aware of a fight that happened some years ago involving Price, Hubbard, Moore, and Moore's uncle. He also learned from Hubbard that Moore, his girlfriend, and his uncle ran into Hubbard at the CVS on Lee and wanted to fight him.

{¶ 16} On December 11, 2020, Howard was interviewed by federal agents in the presence of Cleveland Heights detectives. Howard's attorney and the U.S. Attorney were also present at the interview. At that time, Howard shared information about Moore's murder, and his testimony at trial recounted what he shared in the proffer. He testified that he shared the information with authorities to "clear [his] name in the whole situation to let them know what was going on." (Tr. 702.) Then approximately "three months after they knew that I was telling the truth,

they came and told me, like, okay, we're going to go ahead and drop [your sentence] down for you." (Tr. 702.)

{¶ 17} When discussing the night of the murder, Howard testified that he was with his girlfriend at the time. They were at her house in Cleveland Heights when he received phone calls from Price around 9:30 or 9:45 p.m. Howard answered Price's call around 9:45 p.m., and Price indicated that he had been waiting in Hubbard's driveway for him to come outside. At that time, Hubbard's house was located on Meadowbrook, three blocks down from the house Howard shared with Price and Wilkins. About 20 minutes later, Howard received another call from Price, who seemed distressed, telling Howard to get to their house. Howard then left his girlfriend's house.

{¶ 18} As Howard was driving home, he noticed several police cars nearby. This prompted him to check the camera on his house where he observed Price's Dodge Charger pull into the driveway. Price exited from the driver's side, Hubbard exited from the passenger side, and they both ran into the house. He testified that Price, Hubbard, and Wilkins were all inside when he got home. Price began by telling Howard that he was at the smoke shop on Cedar and Lee when he observed Moore inside. Price then went back to his car and waited for Moore to leave. When Moore left, Price drove to Hubbard's house. Price called Hubbard and told him to come outside. Price called Howard while he was waiting for Hubbard to come outside. When Hubbard came outside, he got in the driver's seat and they drove around to find Moore. The two of them found Moore on Oakdale. Price then jumped

out of the car and blinded Moore with the flashlight on his gun. Howard testified that he had seen this gun before and described it as a black Glock 17 that had a tactical flashlight mounted on it. Price then shot at Moore in rapid fire succession, emptying the clip of his gun.

{¶ 19} Howard testified that as Price was recounting the events, he observed blood on Price's pant leg and shoes. Price told Howard that after he chased Moore and gunned him down, he kicked him in the head to ensure he was dead. Price also told Howard that Moore's pants came down while he was running away. Hubbard and Price both told Howard that after Moore was killed, Hubbard was in shock and could not drive, so Price got in the driver's seat and drove them back to their house. Hubbard further told Howard that he watched Price shoot Moore and that he could not stomach it. With regard to what Hubbard told him, Howard testified that Hubbard was in shock from everything that just happened, but then Hubbard "basically told me everything — he was confirming everything that was said." (Tr. 695.) Hubbard further said that "he ducked his head down a couple[ ] times * * *. He felt like he could feel the shots hitting him." (Tr. 696.)

{¶ 20} Howard also observed Price hand Wilkins the gun, telling him to dispose of it. After the shooting, Price switched his Dodge Charger with another vehicle and did not keep the Charger at their house on Meadowbrook. Howard returned to his girlfriend's house after being apprised of the shooting. Price called Howard, asking him to come back home because he could not be by himself. Howard then left his girlfriend's house and returned home to console Price.

{¶ 21} Howard's ex-girlfriend testified to Howard's whereabouts during the homicide, providing him with an alibi. Furthermore, Howard's phone records were consistent with his account of his whereabouts that evening and, as a result, the police had no probable cause to support that Howard had any involvement with the homicide.

{¶ 22} The state also presented evidence of Price and Hubbard's cell phone records. On the night of the homicide, at 9:59 p.m., Price called Hubbard three times in quick succession and then called Howard. Cell phone data obtained from Price's phone records indicated that some communications from the night of the murder between Price's phone and Hubbard's phone had been deleted prior to the officers taking possession of Price's phone.

{¶ 23} Price's cell phone data also yielded a text conversation that took place one month prior to the homicide where Price references that he has a 9 mm handgun. David Reinhard, the store manager of Fin, Feather, Fur Outfitters, testified that on June 23, 2020, Price purchased a Glock as well as a Streamlight (a flashlight mounted on the front rail of the gun), a Trijicon (a light used at night), two ProMag magazines, one box of Winchester 9 mm ammunition, and two boxes of federal 9 mm ammunition.

{¶ 24} The analysis of forensic evidence revealed that the bullets recovered from the crime scene were consistent with a 9 mm Glock-type firearm and they were all fired from the same firearm. Furthermore, the DNA evidence revealed that the staining from the Dodge Charger's driver side floor mat was a match to Moore and

Price and the front passenger interior door handle and pull was a match to Hubbard. Moore's DNA was also found on the passenger-side floor mat.

{¶ 25} Following the conclusion of trial, the jury found Hubbard guilty of felonious assault and not guilty of the remaining charges and specifications. Price was found guilty of all three counts and specifications. The matter was then continued for sentencing. Price and Hubbard were sentenced at the same hearing. At the hearing, defense counsel noted that Hubbard had no prior felony convictions, was a loving father, and was gainfully employed by the Cleveland Clinic and Case Western Reserve University. The court noted that while Hubbard has no prior felony record, he was found guilty of assault and disorderly conduct in 2013. He was also found guilty of a violation of a protection order, attempted aggravated menacing, and attempted criminal mischief. Defense counsel also pointed out that during the pretrial phase, after the court lowered Hubbard's bond, he attended every scheduled court date and never violated the conditions of his pretrial release.

{¶ 26} Hubbard then addressed the court, stating that "if there is anything that I could do to bring * * * Moore back, I would do it. I did not have anything to do with the shooting of * * * Moore." (Tr. 1374.) The court then stated:

> I'm going to offer you some advice. Don't do what you just did. For you to say that you were not involved in this is ridiculous. You didn't have to be involved in this. But according to the testimony of the witnesses you were driving a car that Price got out of when he fired 17 shots at [Moore], you were driving the car, okay? That's what [Howard] said.
>
> And as a matter of fact, [Howard] said that you were so freaked out when you saw the shooting, that you couldn't drive the car.
>
> * * *

And then you driving the car with your co-defendant essentially stalked the victim down the roadways of Cleveland Heights, through the residential neighborhoods.

* * *

So, for you to stand up and tell me  that you were not involved, and for your attorneys to tell me that they thought the offense was related to the beef 30 days earlier at the CVS is ridiculous[.]

* * *

Qui[te] frankly * * * I mean you are the luckiest guy in the world in a sense because if the jury really, I think, I believe, it's my belief * * [y]ou are the luckiest guy in the world.

Because if [the jury] knew about conspiracy, if they knew about complicity, if they understood it completely, you would be sitting in the same seat as your co-defendant.  You would be convicted of aggravated murder.

That's my thought.  I just presided over the case.  I'm not making a determination as to your guilt or innocence.

* * *

So, for you to stand up in court in front of his family and say what you just said is insulting and I would encourage you to knock it off.

* * *

You are the luckiest guy in the world and I'll say it again.  Had the jury, and maybe it's my fault — whoever's fault — I don't know if we specifically gave them, I can't recall, an instruction on complicity, conspiracy, you would have been convicted, right?

(Tr. 1375-1377, 1379-1380.)[4]

{¶ 27}  Before imposing the sentence, the court noted that "this is a felonious assault that resulted in the death of the victim in this case, and as such, I'm going to

---

[4] A review of the court's jury instructions reveals that the jury was instructed on complicity.  (Tr. 1313-1316.)

sentence you to the harshest possible penalty which is eight years in the State penal institution which under Re[a]gan Tokes could become twelve years." (Tr.1384-1385.)

{¶ 28} Hubbard now appeals, raising the following five assignments of error for review:

> **Assignment of Error One:** [Hubbard] was denied a fair trial under the United States and Ohio constitutions when the trial court failed disallow the hearsay testimony of [Howard], or, in the alternative, sever the matter from that of his co-defendant.

> **Assignment of Error Two:** The trial court erred by failing to grant the motion for judgment of acquittal as to the charge of felonious assault because the state presented insufficient evidence to sustain a guilty verdict.

> **Assignment of Error Three:** [Hubbard's conviction] for felonious assault was against the manifest weight of the evidence.

> **Assignment of Error Four:** As amended by the Reagan Tokes Act, the Revised Code's sentences for first and second degree qualifying felonies violates the constitutions of the United States and the state of Ohio; the trial court plainly erred in imposing a Reagan Tokes indefinite sentence.

> **Assignment of Error Five:** The trial court abused its discretion by considering matters of which [Hubbard] had not been convicted when imposing sentence.

## II. Law and Analysis

### A. Hearsay Evidence & Motion to Sever Trial

{¶ 29} In the first assignment of error, Hubbard argues the trial court abused its discretion when it allowed Howard to testify about statements made by Hubbard. Alternatively, he argues the trial court erred when it denied his motion to sever his trial from Price's trial.

{¶ 30} "It is well settled that the law favors joinder[.]" *State v. Waddy*, 63 Ohio St.3d 424, 429, 588 N.E.2d 819 (1992). If it appears, however, that the defendant would be prejudiced by such joinder, then the trial court is required to order separate trials. Crim.R. 14. We review a trial court's decision on joinder for an abuse of discretion. *State v. Willis*, 8th Dist. Cuyahoga No. 107070, 2019-Ohio-537, ¶ 15, citing *State v. Banks*, 2015-Ohio-5413, 56 N.E.3d 289, ¶ 64 (8th Dist.), citing *State v. Grimes*, 8th Dist. Cuyahoga No. 94827, 2011-Ohio-4406. An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. The defendant "'bears the burden of demonstrating prejudice and that the trial court abused its discretion in denying severance.'" *Willis* at ¶ 10, quoting *State v. Saade*, 8th Dist. Cuyahoga Nos. 80705 and 80706, 2002-Ohio-5564, ¶ 12, citing *State v. Coley*, 93 Ohio St.3d 253, 2001-Ohio-1340, 754 N.E.2d 1129, and *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166.

{¶ 31} We have previously found, however, that if the defendant fails to renew a Crim.R. 14 motion for severance either at the close of the state's case or the close of all evidence, the defendant "'"waives all but plain error on appeal."'" *Willis* at ¶ 15, quoting *Lyndhurst v. Smith*, 8th Dist. Cuyahoga No. 101019, 2015-Ohio-2512, ¶ 32, quoting *State v. Howard*, 3d Dist. Marion No. 9-10-50, 2011-Ohio-3524.

{¶ 32} Here, Hubbard failed to renew his motion to sever at the end of the state's case, which was also at the close of all of the evidence. Thus, Hubbard has

waived all but plain error, and Hubbard conceded to such at appellate oral argument. To demonstrate plain error, Hubbard "must show 'an error, i.e., a deviation from a legal rule' that was 'an "obvious" defect in the trial proceedings,' and that the error 'affected a substantial right,' i.e., a 'reasonable probability' that the error resulted in prejudice, affecting the outcome of the trial." *State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 91 (8th Dist.), quoting *State v. Rogers*, 143 Ohio St. 3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22; *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. "'We recognize plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.""' *Id.* at ¶ 91, quoting *Lyndhurst* at ¶ 32, quoting *State v. Landrum*, 53 Ohio St.3d 107, 110, 559 N.E.2d 710 (1990).

{¶ 33} We find no error in this case regarding the joinder, plain or otherwise. Prior to trial, Hubbard sought to sever his case from Price's case arguing that severance was required because Howard was going to testify about a conversation that happened immediately following the murder during which Price admitted his involvement in Moore's murder and implicated Hubbard as an accomplice. At the hearing on the motion, Hubbard asserted that Howard's testimony about what Price and Hubbard said to him was impermissible hearsay testimony.[5] The state argued that Price's statement was admissible as a statement made by a party-opponent and an adoptive admission. The state explained that when Price was describing how he

---

[5] We note that the parties agreed that Howard's statements were nontestimonial and Hubbard has not addressed this argument on appeal.

killed Moore and Hubbard stated that he "couldn't watch" when Price shot Moore, Hubbard adopted everything Price said. The trial court denied Hubbard's motion to sever finding that Hubbard had adopted the entirety of Price's statement as his own statement.

{¶ 34} "The trial court has broad discretion in the admission or exclusion of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should be slow to interfere." *State v. Davenport*, 8th Dist. Cuyahoga No. 99328, 2013-Ohio-3731, ¶ 6, citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 122. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid. R. 801(C). A statement is not hearsay if it "is offered against a party and is * * * a statement of which the party has manifested an adoption or belief in its truth[.]" Evid. R. 801(D)(2)(b). "Generally, '[a]n adoptive admission, or an admission by acquiescence, consists of a statement by a non-party which may be deemed to be that of a party by virtue of the failure of the party to deny the statement. Evid.R. 801 Staff Notes.'" *Davenport* at ¶ 7. The adoptive admissions doctrine is even applicable in cases where the party "'was present but remained silent when the declaration was made.'" *Id.*, quoting *State v. Matthews*, 47 Ohio St.2d 119, 351 N.E.2d 98 (1976).

{¶ 35} At trial, Howard testified in detail as to what transpired on the evening of Moore's murder. He stated that he received a cell phone call from Price,

who told him he was waiting at Hubbard's house for Hubbard to come outside. Approximately 20 minutes later, Howard received another call from Price telling him to come home. When he arrived, he observed Price, Hubbard, and Wilkins were all inside. Howard testified that Price told him that he was at a smoke shop on Cedar and Lee when he saw Moore. Price then went back to his car and waited for Moore to leave. When Moore left, Price drove to Hubbard's house. He called Hubbard and told him to come outside. Price called Howard while he was waiting for Hubbard to come outside. When Hubbard came outside, he got in the driver's seat and they drove around to find Moore. The two of them found Moore on Oakdale. Price then jumped out of the car and blinded Moore with the flashlight on his gun. Price shot at Moore in rapid fire succession, emptying the clip of his gun. Price kicked Moore in the head to ensure that he was dead.

{¶ 36} Hubbard and Price both told Howard that after Moore was killed, Hubbard was in shock and could not drive, so Price got in the driver's seat and drove them back to their house. Hubbard further told Howard that he watched Price shoot Moore and that he could not stomach it. With regard to what Hubbard told him, Howard testified that Hubbard "basically told me everything — he was confirming everything that was said." (Tr. 695.)

{¶ 37} Hubbard maintains that he was not free to disavow anything Price said and the admission of Howard's testimony is prejudicial error because it is the only evidence linking Hubbard to Moore's shooting. Adoptive admissions, however, are by their nature statements made by a third party to which the party acquiesces,

even through silence. *Davenport*, 8th Dist. Cuyahoga No. 99328, 2013-Ohio-3731 at ¶ 8, citing *Matthews*, 47 Ohio St.2d 119, 351 N.E.2d 98. For this reason, we cannot say that the court abused its discretion in overruling Hubbard's hearsay objection. Price and Hubbard made their statements to Howard immediately following the murder. These statements were adopted by Hubbard through his acquiescence to the validity of the statements. In fact, Hubbard did not deny his role during the shooting; rather he confirmed it when he said that he could not look when Price shot Moore. Furthermore, Howard's testimony was corroborated by other evidence, including the DNA evidence, the surveillance videos, the cell phone records, and the history of bad blood between Moore and Price and Hubbard.

{¶ 38} Having found that Howard's testimony was admissible, we likewise find no prejudice in the joinder of the trial. As previously stated, Howard's testimony was corroborated by other physical evidence presented at trial. Ultimately, the jury found Hubbard guilty of felonious assault and not murder. Hubbard has failed to demonstrate a deviation from a legal rule that was an obvious defect in the trial proceedings, and that the error affected the outcome of the trial.

{¶ 39} Thus, Hubbard has failed to demonstrate plain error and the first assignment of error is overruled.

### B. Sufficiency of the Evidence

{¶ 40} In the second assignment of error, Hubbard argues the trial court erred when it denied his Crim.R. 29(A) motion on the felonious assault charge because the state produced insufficient evidence to sustain a guilty verdict.

{¶ 41} We note that "[a] motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37, citing *State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995); *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 42} With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 43} In *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw

reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

{¶ 44} In the instant case, Hubbard was acquitted of aggravated murder and murder as charged in Counts 1 and 2. He was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *." Hubbard contends the state failed to present sufficient evidence that Hubbard acted knowingly or that he did anything to cause serious physical harm to Moore.

{¶ 45} The evidence at trial revealed that multiple witnesses heard a series of gunshots, separated by a pause, and then another series of gunshots. Those witnesses also described a vehicle with distinctive break lights and a loud exhaust that was subsequently traced to Price. One witness testified that after the shooting, he observed a figure move behind the car from the driver's side to the passenger's side before the car drove away. Cell phone records revealed several calls between Price and Hubbard during the time in question, and surveillance video put Price at the CVS and Twisted Minds at the same time Moore was there. The history between

these parties establishes a motive that Price and Hubbard had reason to retaliate against Moore.

{¶ 46} Furthermore, Howard's testimony provided specific details corroborating the DNA and other facts related to the shooting. Specifically, Howard testified that after the incident, he observed Price exit the driver's seat and Hubbard exit the passenger's seat of the Dodge Charger after it pulled into the driveway of his house. Price told Howard that Moore's pants were down when he stood over him and killed him; he kicked Moore to confirm he was dead, which explained the blood on Price's clothes; and he blinded Moore with the tactical light on his gun, which the evidence confirmed Price purchased a tactical light when he bought his Glock 17 9 mm. Hubbard told Howard that he was initially driving, but he switched seats with Price because he was too worked up to drive, which is consistent with where Moore's DNA was found inside the Dodge Charger.

{¶ 47} An appellate court "is required to view the evidence adduced at trial, both direct and circumstantial, in a light most favorable to the prosecution to determine if a rational trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *State v. Alton*, 8th Dist. Cuyahoga No. 88079, 2007-Ohio-2109, ¶ 37, citing *State v. Dennis*, 79 Ohio St.3d 421, 683 N.E.2d 1096 (1997); *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). And the foregoing facts, when viewed in a light most favorable to the state, establish that Hubbard was complicit in the shooting of Moore and, thus, knowingly caused Moore serious physical harm.

{¶ 48} Therefore, the second assignment of error is overruled.

## C. Manifest Weight of the Evidence

{¶ 49} In the third assignment of error, Hubbard argues that his felonious assault conviction is against the manifest weight of the evidence because the quality of evidence against him was poor and unreliable.

{¶ 50} When reviewing a manifest weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 quoting *Martin* at 175.

{¶ 51} As this court has previously stated:

> The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 52} Hubbard argues that the only evidence linking him to Moore's murder is Howard's testimony, which lacked credibility. Hubbard claims Howard's testimony was riddled with inconsistencies and was unreliable. Hubbard refers to testimony by Howard where he testified that Moore had been wearing basketball shorts at the time, despite previously testifying that he had not been told what the victim was wearing; he repeatedly denied selling drugs, yet his girlfriend testified that Howard sold weed to support himself; and he testified that Hubbard "basically told [him] everything," yet in his proffer, Howard told investigators that Hubbard could not really talk and then left his home. He further argues that Howard had something personal to gain from his testimony because when he first spoke with Cleveland Heights police, he stated that knew nothing about the homicide, but once he was under a federal indictment for weapons charges facing 41 to 51 months in federal prison, he knew every single detail about the shooting.

{¶ 53} While Hubbard attacks Howard's credibility, he does not demonstrate how the jury clearly lost its way and created such a manifest miscarriage of justice. Howard testified that he initially did not say anything to the police because he did not have a lawyer present. With regard to speaking with authorities while his federal charges were pending, Howard testified that he wanted

to "clear [his] name in the whole situation to let [the authorities] know what was going on." (Tr. 702.) He did not receive a reduction in his sentence until approximately three months later. The evidence was clear that Price and Hubbard had a history of fighting with Moore and, on the night of the murder, Price was at the shopping center at the same time as Moore. Price then called Hubbard and the two of them searched for Moore. The evidence placed Hubbard in Price's car and placed Price as the driver after he shot Moore, which is corroborated by Howard's testimony. After reviewing the entire record, weighing the inferences and examining the credibility of witnesses, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. Hubbard's conviction is not against the manifest weight of the evidence.

{¶ 54} Accordingly, the third assignment of error is overruled.

**D. Hubbard's Sentence**

**1. Constitutionality of the Reagan Tokes Law**

{¶ 55} In the fourth assignment of error, Hubbard sets forth several reasons why the Reagan Tokes Law is unconstitutional. In *State v. Hacker*, Slip Opinion No. 2023-Ohio-2535, the Ohio Supreme Court recently addressed similar arguments and found the Reagan Tokes Law to be constitutional. The *Hacker* Court determined the law does not violate the separation-of-powers doctrine, the right to a jury trial, or the right to due process. *Id.* at ¶ 41. In light of this ruling, as well as the fact that Hubbard's arguments do not present novel issues or any new theory

challenging the constitutional validity of any aspect of the Reagan Tokes Law left unaddressed by the *Hacker* Court, we overrule the fourth assignment of error.

## 2. Factors Considered by the Trial Court

{¶ 56} In the fifth assignment of error, Hubbard argues that trial court abused its discretion when it sentenced him to eight to twelve years in prison because the court believed that Hubbard should have been convicted of murder.

{¶ 57} Hubbard asserts this claim because the trial court recounted facts that were presented during the trial evidencing Hubbard's role in Moore's murder in response to Hubbard's statement, which was directed to Moore's family, that he did not have anything to do with Moore's shooting. The trial court felt that this statement demonstrated a complete lack of acceptance of responsibility by Hubbard.

{¶ 58} Hubbard asks this court to review his sentence under *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124. The Ohio Supreme Court, however, has held that the abuse-of-discretion standard set forth in *Kalish* has been superseded by statute and is no longer good law. *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 16. Instead, we follow the standard of review set forth in R.C. 2953.08(G)(2), which provides in relevant part:

> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶ 59} The trial court is also required to consider the principles and purposes of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12. *State v. Cammack*, 8th Dist. Cuyahoga No. 108705, 2020-Ohio-2942, ¶ 25, citing *State v. McGowan*, 8th Dist. Cuyahoga No. 105806, 2018-Ohio-2930, ¶ 11-12.

{¶ 60} Hubbard does not argue that his sentence is contrary to law, the record does not support the court's findings under the relevant statutory provisions, or the trial court failed to consider the felony sentencing factors under R.C. 2929.11 and 2929.12. Rather, he argues that a trial court may not impose a greater sentence upon an offender because of its belief that the offender committed a more serious offense than that for which he was convicted.

{¶ 61} This court has repeatedly found that "unindicted acts or not guilty verdicts can be considered in sentencing without resulting in error when they are not the sole basis for the sentence." *State v. Price*, 2016-Ohio-591, 60 N.E.3d 481, ¶ 15 (8th Dist.), citing *State v. Corbett*, 8th Dist. Cuyahoga No. 99649, 2013-Ohio-4478; *State v. Reeves*, 8th Dist. Cuyahoga No. 100560, 2014-Ohio-3497, ¶ 32; *State v. Martin*, 8th Dist. Cuyahoga No. 87618, 2007-Ohio-1833, ¶ 34. *See also State v. Wiles*, 59 Ohio St. 3d 71, 571 N.E.2d 97 (1990) ("'It is well established that a sentencing judge may take into account facts introduced at trial relating to other

charges, even ones of which the defendant has been acquitted.'" *Id*. at 78, quoting *U.S. v. Donelson*, 224 U.S.App.D.C. 389, 695 F.2d 583, 590 (1982).).

{¶ 62} Here, despite the trial court's consideration of Hubbard's not guilty verdicts, the record provides adequate support for us to conclude that the sentence was not based solely on the acquitted conduct. The trial judge reviewed Hubbard's past criminal conduct and the facts of the felonious assault, which were intertwined with the murder. The court stated that the felonious assault resulted in Moore's death, "and as such, I'm going to sentence you to the harshest possible penalty * * *." Therefore, the sentencing transcript as a whole reflects that Hubbard was not sentenced solely on the acquitted conduct.

{¶ 63} The fifth assignment of error is overruled.

## III. Conclusion

{¶ 64} The trial court did not abuse its discretion by denying Hubbard's motion to sever. Hubbard failed to renew his motion at the close of all the evidence and waived all but plain error on appeal. Howard's testimony of what Price and Hubbard said to him is admissible, and as a result, Hubbard has failed to demonstrate plain error by the joinder of his trial. Furthermore, Hubbard's felonious assault conviction is supported by sufficient evidence and is not against the manifest weight of the evidence. Howard's testimony provided specific details, which were corroborated by other evidence, including the DNA evidence, the surveillance videos, the cell phone records, and the history of bad blood between Moore and Price and Hubbard. Lastly, the sentencing transcript as a whole reflects

that Hubbard was not sentenced solely on the acquitted conduct and the Ohio Supreme Court, in *Hacker*, Slip Opinion No. 2023-Ohio-2535, recently found the Reagan Tokes Law to be constitutional.

{¶ 65} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

MICHELLE J. SHEEHAN, P.J., and
LISA B. FORBES, J., CONCUR